UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| LINDA KENERSON, | ) |
| Plaintiff, | ) |
| v. | ) C.A. No. 1:24-cv-00156-MSM-LDA |
| ELEMETAL DIRECT USA, INC., | ) |
| Defendant. | ) |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Following her termination from Elemetal Direct, USA, LLC, Linda Kenerson sued the company for breach of contract, fraudulent inducement, and violations of the Rhode Island Whistleblowers' Protection Act.[1] (ECF No. 1.) Elemetal moves either to compel arbitration or to transfer the case to the Northern District of Texas. (ECF No. 6.) For the reasons below, the Court will TRANSFER the case to the Northern District of Texas for further proceedings.

I.   BACKGROUND

In 2013, Ms. Kenerson began working for Elemetal, a precious metals refinery based in Dallas, Texas. (ECF No. 1 ¶ 11.) She worked in its Compliance Office in

---

[1] In its Motion to Compel Arbitration, Elemetal notes that it was "incorrectly named Elemetal Direct USA, Inc." in the Complaint and that its proper name is "Elemetal Direct, USA, LLC." (ECF No. 6 at 1.) Ms. Kenerson explains that the company also previously went by "North Texas Refining Metals, USA, LLC." (ECF No. 1 ¶ 11.) For simplicity's sake, the Court will refer to the defendant as "Elemetal."

East Providence, Rhode Island, and she soon became a certified anti-money laundering specialist. *Id.* ¶¶ 11, 14. In 2016, the U.S. Department of Justice began investigating Elemetal; two years later, it imposed a significant fine and other penalties on the company. *Id.* ¶¶ 15–18. Ms. Kenerson was let go in April 2018, allegedly because "the fines imposed by the DOJ made it economically impossible for the company to continue her employment." *Id.* ¶ 18.

Elemetal nonetheless rehired her several months later to work as its sole anti-money laundering specialist. *Id.* ¶ 21. But problems soon arose. Ms. Kenerson alleges that company higher-ups told her that she "had to be a little more lax" on compliance with business regulations. *Id.* ¶ 25. She refused to do so. *Id.* Elemetal then offered to transfer her to a sales position—what she saw as a demotion and punishment for doing her job well. *Id.* ¶ 26. She refused to take the transfer. *Id.* A week after she declined the sales job, Elemetal fired her again. *Id.* ¶ 27. Ms. Kenerson then filed suit in this Court, alleging fraud, breach of contract, and violations of the Rhode Island Whistleblowers' Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1 *et seq.* (ECF No. 1 ¶¶ 32–47.) Elemetal now moves to compel arbitration in Dallas, Texas, based on two arbitration agreements Ms. Kenerson signed (together, "the Agreements"). (ECF No. 6.) Alternatively, it moves to transfer venue to the Northern District of Texas, which encompasses Dallas. *Id.*

## II.   DISCUSSION

To resolve Elemetal's Motion, the Court must answer two main questions: (1) whether the parties had a valid arbitration agreement to enforce, and (2) if so, what the right remedy is.

### A.   The Arbitration Agreements' Validity

In deciding a motion to compel arbitration, the Court must first determine (1) whether "there exists a written agreement to arbitrate," (2) whether "the dispute falls within the scope of that arbitration agreement" and (3) whether "the party seeking an arbitral forum has not waived its right to arbitration." *Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 4 (1st Cir. 2012) (internal quotation omitted). If those elements are satisfied, the Federal Arbitration Act ("FAA") requires the Court, upon a party's motion, to stay any litigation until arbitration "has been had in accordance with the terms of the agreement," as long as the moving party "is not in default in proceeding with such arbitration." 9 U.S.C. § 3. If the Court is "satisfied that the making of the agreement for arbitration or the failure to comply" is not in issue, the Court must typically compel the parties "to proceed to arbitration." 9 U.S.C. § 4.

The Court starts with whether Ms. Kenerson and Elemetal had a valid arbitration agreement. The Supreme Court has made clear that arbitration agreements should be treated like any other contract, so "principles of state contract law control the determination of whether a valid agreement to arbitrate exists." *Gove*, 689 F.3d at 4; *see, e.g., Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010).

3

But first, the Court briefly detours to address a preliminary question: whose contract law applies? The Agreements state that actions to compel arbitration are governed by "the Federal Arbitration Act and the laws of the State of Texas." (ECF No. 6-3 ¶ 2; No. 6-4 ¶ 2.) However, both parties rely largely on Rhode Island law to answer questions about contract formation and fraud. *See, e.g.*, ECF No. 6-1 at 7–8; ECF No. 9-1 at 6. Neither cite Texas law. Still, there is a strong preference for applying the laws chosen by the Agreements, and neither party has explained why that preference should be discarded here. *See Rafael Rodriguez Barril, Inc. v. Conbraco Indus., Inc.*, 619 F.3d 90, 93 (1st Cir. 2010) (explaining that forum selection clauses and choice-of-law clauses control "absent a strong showing that [they] should be set aside") (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). Therefore, Texas law will determine the agreement's validity.[2]

In Texas, a valid contract requires that "(1) an offer was made; (2) the other party accepted in strict compliance with the terms of the offer; (3) the parties had a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

All those requirements are met here. Ms. Kenerson signed two arbitration agreements with Elemetal: one on October 27, 2013, the first time she was hired, and

---

[2] The outcome would be the same if Rhode Island law applied, because there are no meaningful distinctions between Rhode Island and Texas on the straightforward questions of contract law raised by this Motion.

4

another on June 20, 2018, the second time she was hired. (ECF No. 6-3 at 2; No. 6-4 at 3.) Each time, the arbitration agreement was offered "as a condition of employment with Elemetal." (ECF No. 6-3 at 1; No. 6-4 at 1.) The Agreements constituted offers and her signatures acceptances. *See, e.g., Alorica v. Tovar*, 569 S.W.3d 736, 740 (Tex. App. 2018) ("A signature, electronic or otherwise, is generally deemed to be sufficient to show assent to an arbitration agreement."). Along with those signatures, her two stints at Elemetal—first from 2013 to 2018, then from 2018 to 2021—show her consent to the Agreements and her intent to be bound by them. *Alorica*, 569 S.W.3d at 740–41 ("So long as an employee receives proper notice of the arbitration agreement, our courts will infer that the employee's decision to continue showing up for work thereafter demonstrates the employee's consent to arbitrate employment disputes.").

Ms. Kenerson's main sticking point is mutual assent. She alleges that Elemental "made false representations to her bearing on its requirement that she sign the arbitration agreement – *i.e.,* that she would have permanent employment." (ECF No. 9-1 at 6.) In other words, had Elemental not promised Ms. Kenerson "permanent employment," she would not have taken the job, and thus not signed the Agreements. But that argument falls short for two reasons.

First, disagreements about employment terms—fundamental as they might be in the overall contract between the parties—do not always bear on the validity of a fully integrated arbitration agreement. (ECF No. 6-4 ¶ 9 ("This is the complete agreement between the parties on the subject of arbitration. No representations, oral

5

or written, are being relied upon by either party in executing this Agreement, other than those contained herein.")). And nothing in the record suggests that Ms. Kenerson was induced specifically into signing the arbitration clause in exchange for "permanent employment," just that she was induced into working for Elemetal. That cannot by itself invalidate an arbitration agreement. *See, e.g., Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 56 (Tex. 2008) ("While an arbitration agreement procured by fraud is unenforceable, the party opposing arbitration must show that the fraud relates to the arbitration provision specifically, not to the broader contract in which it appears."); *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001) (explaining that "defenses must specifically relate to the Arbitration Addendum itself, not the contract as a whole, if they are to defeat arbitration" and that "defenses that pertain to the entire … contract can be arbitrated"). Thus, the dispute about inducement falls within the Agreements' scope, rather than affecting their validity.

Second, Ms. Kenerson had a right to opt out of the 2018 Agreement and, based on the record, failed to do so. On its third page, Elemetal gives employees the option to decline to arbitrate their claims. (ECF No. 6-4 ¶ 11 ("Employee may opt-out of this Agreement by delivering, within 30 days of the date this Agreement is provided to Employee, a completed and signed Opt-Out Form to the Company's General Counsel at the above address.")). So even if Ms. Kenerson were induced into working for Elemetal through false promises of "permanent employment," she was not forced into arbitrating claims with it; she could have exercised her right to opt out of arbitration, but she did not.

Ms. Kenerson argues separately that the Agreements' provision requiring arbitration in Dallas imposes "substantial, punitive, inequitable barriers" between her and her rights. (ECF No. 9-1 at 7–9.) The Court recognizes the real challenges that arbitration may impose on her, but there are two problems with her theory. First, the Agreements and their circumstances would put a reasonable person on notice about the possibility of arbitration in Dallas. For example, when Ms. Kenerson joined the company in 2013, it was called "North Texas Refining." (ECF No. 1 ¶ 11.) The two-page agreement she signed back in 2013 stated that any arbitration "will be held in Dallas, Texas." (ECF No. 6-3 ¶ 4.) When she signed a new three-page arbitration agreement in 2018, following her reinstatement, she flew to Dallas—where the company was headquartered—to do so. *Id.* ¶ 20. And the second agreement said the same thing as the first: any arbitration would be in Dallas. (ECF No. 6-4 ¶ 4.) The second and more fundamental issue is that she could have opted out of the arbitration requirement in 2018, but she did not. (ECF No. 6-4 ¶ 11.) Though arbitration imposes some challenges on her now, she never had to accept these terms in the first place. Thus, the Court finds that there was a valid arbitration agreement between Elemetal and Ms. Kenerson.

Next, the Court examines whether the Agreements' scope reaches Ms. Kenerson's claims—common-law breach of contract and fraudulent inducement, as well as statutory claims arising under the RIWPA. *Gove*, 689 F.3d at 4. The 2018 Agreement covers "all disputes and claims between [Elemetal and its employees], including those relating to Employee's employment with the Company and any

7

separation therefrom." (ECF No. 6-4 ¶ 1.) That includes "claims for discrimination, harassment or retaliation; wages, overtime benefits, or other compensation; breach of any express or implied contract; violation of public policy; personal injury; and tort claims including defamation, fraud, and emotional distress." *Id.* The 2013 Agreement includes exactly the same language. (ECF No. 6-3 ¶ 1.)

The Agreements cover both of Ms. Kenerson's common-law claims. They expressly extend to "breach of any express or implied contract," and she has brought a typical breach of contract claim. (ECF No. 1 ¶ 36—43.) On this point, she agrees. (ECF No. 9-1 at 7.) The Agreements also cover her fraudulent inducement claim. Fraudulent inducement is, as the Texas Supreme Court has explained, a "species of common-law fraud that arises only in the context of a contract." *Int'l Bus. Mach. Corp v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019) (cleaned up). A successful fraudulent inducement claim requires the same proof as a "broader common-law fraud claim," but it revolves around contract formation: the defendant "falsely promises to perform a future act while having no present intent to perform it," and the plaintiff's reliance on the false promise "induces" the plaintiff to agree to the contract. *Id.* Because the agreement covers both "breach of any express or implied contract" and "tort claims including … fraud," it covers Ms. Kenerson's fraudulent inducement claim no matter how she describes it.[3] (ECF No. 6-4 ¶ 1.)

---

[3] Because the Court is analyzing whether this claim falls within the scope of the arbitration agreement, Texas law still controls. (ECF No. 6-4 ¶ 3.) But the Court would reach the same result if Rhode Island law applied. The Rhode Island Supreme Court has characterized fraudulent inducement as either an action in contract or in fraud, depending on the remedy sought. *LaFazia v. Howe*, 575 A.2d 182, 184 (R.I.

8

Finally, the Agreements cover Ms. Kenerson's claims under the RIWPA. Recall that the Agreements extend to "all disputes and claims" between Ms. Kenerson and Elemetal, "including those relating to [her] employment with the Company and any separation therefrom," and including claims "for discrimination, harassment, or retaliation" as well as "violation of public policy." (ECF No. 6-4 ¶ 1.) That is exactly what Ms. Kenerson alleged in her Complaint: Elemetal "has discriminated and retaliated against her … because she complained" to the company about its allegedly "unlawful conduct … and her implication that she was obligated to take remedial action." (ECF No. 1 ¶ 33.) And in her response, she twice refers to the "public policy" goals protected by the RIWPA; the Agreements expressly cover violations of "public policy." (ECF No. 9-1 at 10; No. 6-4 ¶ 1.) Finally, nothing in the RIWPA limits the parties' abilities to arbitrate these claims. All that only leads to one conclusion: the Agreements' sweep reaches RIWPA claims.

The Court briefly addresses whether Elemetal has waived its right to arbitration, the third step of the analysis. *Gove*, 689 F.3d at 4. In Texas, waiver "must be decided on a case-by-case basis, and … courts should look to the totality of the circumstances." *Perry Homes v. Cull*, 258 S.W.3d 580, 591 (Tex. 2008).[4] No facts

---

1990). The plaintiff can seek to "rescind the contract or affirm the contract and sue for damages," but the "tort claim and the claim for recission" are really "alternative theories of relief" arising from the same cause of action. *Id.* (internal citation omitted). Both contract and fraud claims are covered by the agreement.

[4] So too in Rhode Island. Its Supreme Court has similarly established that determining "whether a party has waived its contractual right to arbitration is based on all of the facts of the case, rather than on general formulations of what constitutes

9

here suggest that Elemetal waived its right to arbitration, and Ms. Kenerson does not argue that either. In fact, once she filed suit, Elemental's first substantive motion was to compel arbitration. (ECF No. 6.) So Elemental has not waived its right to arbitrate.

The Court finds that a valid arbitration agreement existed, that Ms. Kenerson's claims fall within the scope of that agreement, and that Elemetal did not waive its right to arbitrate.

### B.   The Remedy

That leaves the question of remedy, which reveals a tension within § 4 of the FAA. One part of that section mandates that arbitration proceedings "shall be within the district in which the petition for an order directing such arbitration is filed." 9 U.S.C. § 4. Read in isolation, that would mean that the Court must compel arbitration in Rhode Island, "because federal courts can only compel arbitration at a location within their district." *Booth v. Citizens Bank, N.A.*, 691 F. Supp. 3d 443, 450 n.8 (D.R.I. 2023).

But other parts of 9 U.S.C. § 4 require that the Agreements, if valid, be enforced to the letter. 9 U.S.C. § 4 (permitting aggrieved parties to petition the court "for an order directing that such arbitration proceed in the manner provided *for in such agreement*" and directing that, upon proper motion, "the court shall make an order directing the parties to proceed to arbitration *in accordance with the terms of the*

---

a waiver." *Newman v. Valleywood Assoc., Inc.*, 874 A.2d 1286, 1291 (R.I. 2005) (cleaned up).

10

*agreement"*) (emphasis added). The First Circuit has made the same point clear in the specific context of arbitration forum selection clauses. *See, e.g., KKW Enter. v. Gloria Jean's Gourmet Coffees Franchising Corp.*, 184 F.3d 42, 52 (1st Cir. 1999) ("Their choice of arbitral forum should have been honored by the district court. Courts may not rewrite the parties' agreements and compel arbitration of their dispute in a forum which is not one of those enumerated in an arbitration agreement's forum selection clause.")

Here, both Agreements state that any arbitration "will be held in Dallas, Texas." (ECF No. 6-3 ¶ 4; No. 6-4 ¶ 4.) This "mandatory" arbitration-forum selection clause means that only Dallas is the appropriate venue. *See Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 17 (1st Cir. 2009) (Permissive forum selection clauses "authorize jurisdiction and venue in a designated forum, but do not prohibit litigation elsewhere," while "mandatory forum selection clauses contain clear language indicating that jurisdiction and venue are appropriate exclusively in the designated forum.") (quoting 14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3803.1 (3d ed.1998)) (cleaned up).

Recognizing the tension baked into § 4, "courts have taken three approaches" when "a motion to compel arbitration is brought outside the district in which the arbitration agreement specifies that arbitration shall occur." *Hetrick Co. v. IINK Corp.*, 710 F. Supp. 3d 467, 493–94 (E.D.V.A. 2024). The first approach "permits a district court to compel arbitration in the district specified in the arbitration agreement even if that is not the district in which the petition for arbitration was

11

filed." *Id.* at 493. The second "holds that a district court may compel arbitration in its district notwithstanding the designation of a contrary forum in the arbitration clause." *Id.* The "third and majority" approach "holds that where an 'arbitration agreement contains a forum selection clause, only the district court in that forum can issue a § 4 order compelling arbitration.'" *Id.* at 494 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 327–28 (7th Cir. 1995), and collecting cases).

The First Circuit has not weighed in on this split, but "the plain text of the FAA and the national caselaw make clear" that the third approach "is the only disposition authorized by Congress." *Hetrick Co.*, 710 F. Supp. 3d at 494. The first approach falls short because the FAA requires that arbitration "shall" be in the district where the case lives. 9 U.S.C. § 4. This mandatory language leaves no discretion for the district court to order arbitration in a different district. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Escoe v. Zerbst*, 295 U.S. 490, 493 (1935) ("Shall ... is the language of command" and ordinarily "makes the act ... mandatory."). The second approach falls short because at least two other parts of § 4 require that the Agreements' terms, including its venue provisions, be enforced. *Hetrick Co.*, 710 F. Supp. 3d at 495 ("First, a party may only petition 'for an order directing that [ ] arbitration proceed in the manner provided for in [the arbitration] agreement.' Second, a court may only 'make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.'") (quoting 9 U.S.C. § 4) (cleaned up). Only the third approach remains, and it both

12

"conforms with the judgment reached by most courts confronted with this question" and is "most faithful to the text of the FAA." *Hetrick Co.*, 710 F. Supp. 3d at 496. So this Court cannot compel arbitration in either Rhode Island or Dallas while complying with the FAA's competing mandates.

All that leads to the alternative remedy Elemetal seeks: a change of venue to the Northern District of Texas. (ECF No. 6-1 at 7–11.) The Supreme Court has explained that an agreement to arbitrate in a specific state is "in effect, a specialized kind of forum-selection clause." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974); *see also Hetrick Co.*, 710 F. Supp. 3d at 496. And although a forum selection clause does not render venue improper under § 1391(b), and cannot be enforced under § 1406(a), the clause "may be enforced through a motion to transfer under § 1404(a)." *Atl. Marine Const. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 59 (2013); *see also Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 32 (1988) ("§ 1404(a) governs the District Court's decision whether to give effect to the parties' forum-selection clause") (cleaned up). That is exactly what Elemetal seeks. (ECF No. 6-1 at 7.)

Under § 1404(a), "a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented" in service of "the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a). The rule "permits transfer to any district where venue is also proper" or "any other district to which the parties have agreed by contract or stipulation." *Atl. Marine Const. Co.*, 571 U.S. at 60.

13

The Supreme Court has made clear that, so long as there is a valid forum clause, the usual § 1404(a) analysis changes in three important ways. First, "the plaintiff's choice of forum merits no weight." *Id.* at 63. Second, the Court should "not consider arguments about the parties' private interests," since they "weigh entirely in favor of the preselected forum." *Id.* at 64. Finally, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules—a factor that in some circumstances may affect public-interest considerations." *Id.* at 64.

That is to say: the Court should enforce an arbitration agreement's forum selection clause under § 1404(a) so long as it is valid and there are no truly exceptional circumstances to justify departure from the clause. *Id.* at 63 (explaining that "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases") (cleaned up). It is "well established that forum selection clauses 'are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances.'" *Rivera*, 575 F.3d at 18 (quoting *Zapata Off-Shore Co.*, 407 U.S. at 10). More particularly, "a forum selection clause should be enforced" unless the opposing party shows (1) "that enforcement would be unreasonable and unjust," (2) "that the clause was invalid for such reasons as fraud or overreaching," or (3) that "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute

14

or by judicial decision." *Rivera*, 575 F.3d at 18 (quoting *Zapata Off-Shore Co.*, 407 U.S. at 15).

The Agreements themselves are valid, and on balance, Ms. Kenerson fails to show that arbitrating in Dallas is "unreasonable" or "unjust." *Rivera*, 575 F.3d at 18. Ms. Kenerson's claims about fraud in the employment contract do not relate to the forum selection clause's validity. *Id.* And finally, Ms. Kenerson fails to show that enforcement would "contravene" a "strong public policy" of Rhode Island. The Court is thus satisfied that the Agreements' forum selection clause is valid and that a transfer of venue to the Northern District of Texas is appropriate under § 1404(a).

### III.  CONCLUSION

For these reasons, Elemetal's Motion (ECF No. 6) is GRANTED, insofar as the Court will TRANSFER the case to the Northern District of Texas for further proceedings. IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge
October 28, 2024

15